UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------X
TIFFANY (NJ) LLC and
TIFFANY AND COMPANY,

                  Plaintiffs,      **MEMORANDUM AND ORDER**

      - against -           11 Civ. 4976 (NRB)

BRUCE FORBSE, CHEN JIA WEN,
GIMI WOOTEN, HU XIN XING,
ALYARICA LTD, TIFFANY JEWELRIES,
INC., TIFFANY-GIFTS, INC., UNITED
MERCHANTS, LTD, and WEB SALE
MERCHANTS LLP, all d/b/a TIFFANY-
COLLECTIONS.COM, TIFFANY-GIFTS.COM,
TIFFANY-JEWELRIES.US,
TIFFANYINSIDESALES.COM, UK-TIFFANY-
GIFTS.COM, BEST10BRANDS.COM,
and TRUSTED-SELLER.EU; ABC COMPANIES;
and JOHN DOES,

                  Defendants.
---------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    Presently before the Court is the motion of non-parties
China Merchants Bank ("CMB"), Bank of China ("BOC"), and
Industrial and Commercial Bank of China ("ICBC") (collectively,
the "Banks") to modify the preliminary injunction entered by the
Court on August 3, 2011, which, <u>inter</u> <u>alia</u>, requires the Banks
to produce records and restrain assets located in China.
Plaintiffs Tiffany (NJ) LLC and Tiffany and Company
(collectively, "Tiffany") have filed a cross-motion to compel
compliance by the Banks with the preliminary injunction.

For the reasons set forth below, we modify the preliminary injunction with respect to ICBC and CMB and require Tiffany to seek discovery from these entities through the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters (the "Hague Convention"). However, we decline to adopt this option with respect to BOC and instead order BOC to comply with the discovery provisions of the preliminary injunction. Finally, we grant Tiffany's cross-motion to compel compliance – by all three banks – with the asset restraint provisions of the preliminary injunction.

**BACKGROUND**[1]

I.    **Factual History**

On July 20, 2011, Tiffany filed the instant suit alleging that defendants willfully used, reproduced, and copied Tiffany's trademarks through the sale of counterfeit products on various websites. Tiffany asserts causes of action under the Lanham Act, 15 U.S.C. § 1051, et seq., and under New York statutory and common law. None of the defendants have yet appeared in the action.

Also on July 20, 2011, the Court entered a temporary restraining order, which the Court converted into a preliminary

---

[1] The background is derived from Tiffany's complaint, filed July 20, 2011, the Declaration of Dwight A. Healy ("Healy Decl."), filed November 23, 2011, and the exhibits annexed thereto, and the Declaration of Robert L. Weigel ("Weigel Decl."), filed December 9, 2011, and the exhibits annexed thereto.

injunction on August 3, 2011. Relevant for present purposes are provisions of the preliminary injunction that order expedited discovery from third-party financial institutions and that require such institutions to restrain defendants' assets. With regard to the expedited discovery, the preliminary injunction orders financial institutions to provide "all records in their possession, custody, or control, regardless of whether such records are maintained in the United States or abroad, concerning the assets and financial transactions of Defendants or any other entities acting in concert or participation with Defendants . . . ." (Docket no. 10 at 10-11.) The preliminary injunction specifically identifies three accounts at CMB, one account at ICBC, and one account at BOC as being subject to the discovery requirements, as PayPal records indicate that these accounts were maintained or used by defendant Wooten in the course of the alleged unlawful activities. (Id. at 11-12; Weigel Decl. ¶¶ 7-10.)

With regard to the asset restraint, the preliminary injunction enjoins third-party financial institutions from "transferring, disposing of, or secreting any money, stocks, bonds, real or personal property, or other assets of Defendants . . . regardless of whether such accounts are located in the United States or abroad." (Docket no. 10 at 7.) The preliminary injunction again lists the five accounts at CMB, ICBC, and BOC

identified through PayPal records as accounts for which the asset restraint is applicable. (Id. at 8.)

Tiffany provided the Banks with notice of the preliminary injunction by delivering a letter to the New York branch of each of the Banks on August 4, 2011. (Healy Decl. Exs. 8-10.) By letters of August 9, 2011 and August 12, 2011, the Banks informed Tiffany that their respective New York branches did not hold accounts or assets for the named defendants and that the New York branches did not have access to or control over any accounts located outside the United States. (Id. Exs. 12-13.) The Banks further maintained that Chinese law would prohibit them from disclosing or freezing any accounts located in China without proper authorization. (Id.)

The Banks filed the instant motion on November 23, 2011 and Tiffany filed its cross-motion on December 9, 2011. The Banks contend that because Chinese bank-secrecy laws prohibit the production of bank records held in China, the appropriate mechanism for Tiffany to seek such records is the Hague Convention. The Banks also contend that there is no source of authority for the Court to apply an asset restraint under these circumstances to funds held by the Banks outside the United States.

## II.  <u>Revelation of BOC's Role as an Acquiring Bank</u>

The Court held oral argument on the motions on April 20, 2012. At oral argument, counsel for Tiffany notified the Court that an infringing website operated by defendant Wooten that Tiffany believed it had previously shut down, known as TiffanyOutletStore.com, was once again up and operating.[2] (Tr. of Oral Arg. at 7:2-16, 10:6-15.) Several days after oral argument, Tiffany informed the Court that its investigator had learned from Visa that BOC was acting as the "acquiring bank" for TiffanyOutletStore.com. (Docket no. 35.) As discussed in greater detail <u>infra</u>, an acquiring bank helps to process online purchases by serving as an intermediary between the online merchant and a credit card network such as Visa. <u>See</u> <u>Visa International Operating Regulations Core Principles</u>, App'x A, B (effective          Oct.       15,       2011),       <u>available          at</u> http://usa.visa.com/download/merchants/visa-core-principles.pdf; <u>see also</u> Kelly Y. Yang, Note, <u>Paying for Infringement: Implicating Credit Card Networks in Secondary Trademark Liability</u>, 26 Berkeley Tech. L.J. 687, 696-97 (2011). The acquiring bank is also often responsible for performing due diligence on the merchant and accordingly often accepts the risk

---

[2] This website is not one of the named defendants, but it was included on a list of roughly 100 websites maintained by Wooten that GoDaddy provided to Tiffany in response to the preliminary injunction. (Tr. of Oral Arg. at 7:2-16.)

of "chargebacks," meaning customer disputes that result in a reversal of a transaction. See Yang, supra, at 703-04.

BOC responded to this newly revealed information by letter of April 30, 2012. BOC reported that TiffanyOutletStore.com was neither a "primary merchant" nor a "secondary merchant" of BOC. (Docket no. 36.) BOC explained that a primary merchant is an online merchant with whom the acquiring bank directly contracts, while a "secondary merchant" is one who, with the knowledge of the acquiring bank, enters an agreement with a primary merchant to use the acquiring bank's credit card-processing systems. (Id.) BOC's understanding is that a secondary merchant had afforded TiffanyOutletStore.com unauthorized access to BOC's payment-processing services. (Id.) BOC notified the Court that it had shut down the secondary merchant's access and terminated its service, but BOC did not provide the Court with any information as to the identity or nature of this secondary merchant. (Id.)

## III. **Prior Litigation**

This suit represents just one installment in a series of suits recently initiated by Tiffany and similarly situated plaintiffs against foreign defendants for alleged counterfeiting activities. The ability of the plaintiffs in these actions to enlist the aid of foreign financial institutions such as the Banks has presented a common point of contention across the

suits. In fact, at least two courts in this jurisdiction have already addressed the precise legal issues raised in the motions now before this Court.

In <u>Tiffany (NJ) LLC v. Qi Andrew</u>, 276 F.R.D. 143, 160-61 (S.D.N.Y. 2011), in an Opinion and Order later affirmed by Judge Pauley, Magistrate Judge Pitman ordered Tiffany to submit its discovery request to the Banks through the Hague Convention as a matter of first resort.[3] In contrast, in <u>Gucci Am., Inc. v. Weixing Li</u>, No. 10 Civ. 4974 (RJS), 2011 WL 6156936, at *12 (S.D.N.Y. Aug. 23, 2011), Judge Sullivan chose not to employ the Hague Convention process and instead ordered BOC to comply with the plaintiff's subpoena. In addition, Judge Sullivan held that because the plaintiff sought final equitable relief in the form of an accounting of the defendants' profits, the court had the inherent equitable power to restrain the defendants' assets as a preliminary measure, regardless of whether those assets were located abroad. <u>See</u> <u>id.</u> at *4.

It is against the backdrop of these recent decisions, as well as the pending and likely future suits presenting analogous circumstances, that we decide the present motions.

---

[3] Judge Pitman did not address the asset restraint issue.

**DISCUSSION**

**I.    Document Production**

    **A. Possession, Custody, or Control of Documents**

As an initial matter, the Banks suggest that their New York branches – upon whom the preliminary injunction was served – do not have "possession, custody, or control" of account records held at branches outside the United States.

We reject this contention. As noted by Judge Pitman, the Banks' New York branches are not subsidiaries of a foreign parent company, but rather are "branches of the same corporate entities as their counterparts in China."[4] Qi Andrew, 276 F.R.D. at 147 n.1. The Court thus has personal jurisdiction over the Banks as corporate entities, id., and "there is a presumption that a corporation is in the possession and control of its own books and records." First Nat'l City Bank of N.Y. v. IRS, 271 F.2d 616, 618 (2d Cir. 1959). "Clear proof of lack of possession and control is necessary to rebut the presumption." Id.

Here, the Banks have not satisfied this burden. Although the Banks have produced declarations from managers of the New York branches indicating that employees of these branches do not have access to documents or other information located in China,

---

[4] For this reason, the cases relied upon by the Banks are inapposite. Cf. Linde v. Arab Bank, PLC, 262 F.R.D. 136, 141-45 (E.D.N.Y. 2009) (finding lack of control in the context of a domestic subsidiary and a foreign parent company); Zenith Elecs. LLC v. Vizio, Inc., No. M8-85, 2009 WL 3094889, at *1-2 (S.D.N.Y. Sept. 25, 2009) (same).

8

the Banks have not provided any evidence to suggest that the larger corporate entities do not have custody over the records.[5] See <u>Qi Andrew</u>, 276 F.R.D. at 149-50. Therefore, we find that the documents sought are in the "possession, custody, or control" of the Banks for purposes of the preliminary injunction. <u>See</u> <u>id.</u>; <u>see also</u> <u>Eitzen Bulk A/S v. Bank of India</u>, No. 09 Civ. 10118 (AKH), 2011 WL 4639823, at *3 (S.D.N.Y. Oct. 5, 2011); <u>Dietrich v. Bauer</u>, No. 95 Civ. 7051 (RWS), 2000 WL 1171132, at *4 (S.D.N.Y. Aug. 16, 2000).

### B. **Comity Analysis**

As previously referenced, the Banks contend that the production of account records located in China is prohibited under Chinese law. Specifically, the Banks cite the following statutes and regulations as barriers to their compliance with the requested discovery:

> <u>Article 6 of the Commercial Banking Law</u>: "Commercial banks shall safeguard the legal rights and interests of the depositors against the encroachment of any entity or individual." (Decl. of Zhipan Wu ("Wu Decl.") Ex. B-1.)

> <u>Article 53 of the Commercial Banking Law</u>: "No employee of a commercial bank may divulge any state or commercial secret they acquire during their term of service." (<u>Id.</u>)

---

[5] In this vein, it is revealing that BOC was able to quickly produce the relevant documents located at its Chinese branch following Judge Sullivan's decision in <u>Weixing Li</u>. (<u>See</u> Weigel Decl. Ex. 26.)

Article 24 of the Corporate Deposit Regulations: "A financial institution shall keep secret the deposits of corporate depositors . . . ." (Id. Ex. B-2.)

Article 28 of the Corporate Deposit Regulations: "In case a commercial bank violates Article 24 . . . and divulges the deposit information of corporate depositors or acts as an agent for inquiry about, freeze or deduction of corporate deposit without statutory procedures, it shall be punished according to Article 73 of the [Commercial Banking Law]." (Id.)

Article 32 of the Savings Regulations: "Savings institutions and their personnel shall have an obligation to keep secret the depositors' savings and relevant information. Savings institutions shall not inquire into, freeze or allocate savings deposits on behalf of any unit or individual, unless otherwise provided for by laws and administrative regulations of the State." (Id. Ex. B-3.)

The Banks explain that China's "Financial Institution Assistant Regulations" delineate the conditions under which financial institutions are permitted to freeze assets or disclose account information despite the above prohibitions. (Id. ¶ 16.) One of the required conditions is that the request be initiated by a "competent organ." (Id.) The list of competent organs includes various Chinese government authorities, but it does not include a foreign court. (Id. ¶ 17.)

The Banks suggest that violations of the above provisions could subject them and their employees to both civil and criminal liability. Under Article 73 of the Commercial Banking Law, civil liability attaches for "[i]llegally inquiring about,

freezing, or deducting personal savings deposit account or entity deposit account." (Id. Ex. B-1.) Criminal liability could potentially arise under Article 253(A) of China's Criminal Law, which provides, "Where . . . an entity in such a field as finance . . . sells or illegally provides personal information on citizens, . . . if the circumstances are serious, [it may] be sentenced to fixed-term imprisonment not more than three years or criminal detention, and/or be fined." (Id. Ex. B-6.)

Tiffany and the Banks agree that because production of the requested documents would be in contravention of a foreign nation's laws, the Restatement (Third) of Foreign Relations Law of the United States (the "Restatement") § 442(1)(c) provides the guiding framework for the Court's analysis. Under the Restatement, the Court must consider: (1) "the importance to the . . . litigation of the documents or other information requested;" (2) "the degree of specificity of the request;" (3) "whether the information originated in the United States;" (4) "the availability of alternative means of securing the information;" and (5) "the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located." Weixing Li, 2011 WL 6156936, at *5 (quoting Restatement § 442(1)(c)). In addition, courts in this Circuit consider the

11

following two factors in engaging in the relevant comity analysis: the hardship of compliance on the party from whom discovery is sought and whether that party has proceeded in good faith. Id. (citing Minpeco, S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517, 523 (S.D.N.Y. 1987)).

Notably, despite reaching differing conclusions, both Judge Sullivan and Judge Pitman considered the seven factors outlined above in determining whether to order the Banks to produce the requested documents.

### 1.   Importance of the Documents to the Litigation

It is plain that the information Tiffany seeks from each of the banks is highly important to the litigation. The account records are likely necessary to calculate defendants' profits in connection with the infringement, and the records may also enable Tiffany to identify additional participants in the scheme. See id. at *6; Qi Andrew, 276 F.R.D. at 151-52.

However, the information sought through the preliminary injunction may hold greatly added significance with respect to BOC given that BOC was serving as the acquiring bank for one of the infringing websites. As Tiffany noted in its letter to the Court of May 2, 2012, although BOC asserts that it did not know of its relationship with TiffanyOutletStore.com, BOC has provided no information as to the primary and secondary merchants through whom TiffanyOutletStore.com gained access to

BOC's credit card-processing systems. (Docket no. 37.) There is a substantial possibility that the owner of the primary or secondary merchant account is defendant Wooten or a John Doe Defendant acting in concert with Wooten. Because of the due diligence that acquiring banks generally perform on the merchants with whom they do business – including often a physical inspection of the merchant's premises - BOC could have valuable information as to the identity, business activities, and even location of one or more defendants.[6] Moreover, because BOC was until just a short time ago processing credit card payments for TiffanyOutletStore.com, BOC has extremely recent information on where defendants are depositing the proceeds of their counterfeiting activities. Access to this information could afford Tiffany a legitimate opportunity to locate defendants' assets and recover at least a portion of defendants' profits.

We therefore hold that this factor weighs in favor of Tiffany in relation to all three banks, but it weighs especially strongly in Tiffany's favor vis-à-vis BOC.

---

[6] For general information on the diligence performed by an acquiring bank, see Federal Financial Institution Examination Council, FFIEC IT Examination HandBook InfoBase, Merchant Acquiring, http://ithandbook.ffiec.gov/it-booklets/retail-payment-systems/retail-payment-systems-risk-management/retail-payment-instrument-specific-risk-management-controls/merchant-acquiring.aspx (last visited May 22, 2012) (website of federal interagency body overseeing financial institutions).

### 2.  <u>Specificity of the Request</u>

We also find that Tiffany's request is sufficiently specific. <u>See</u> <u>Weixing Li</u>, 2011 WL 6156936, at *6; <u>Qi Andrew</u>, 276 F.R.D. at 152. A central purpose of the production request is to enable Tiffany to discover the scope of defendants' infringement, and to accomplish this goal it would seem necessary for the discovery order to apply to all accounts maintained by defendants or those who are shown to have acted in concert with them.

### 3.  <u>Where the Information Originated</u>

Tiffany suggests that the information at issue is "available in the United States" because the Banks provide online banking services to their customers and therefore those customers can access their account information from anywhere in the world. (Pls.' Mem. of Law in Opp'n to Third Party Banks' Mot. for Modification of the Prelim. Inj., and in Supp. of Cross-Mot. to Compel Compliance with the Prelim. Inj. ("Pl.'s Mem.") at 14.)

We find this fact to be of little relevance for present purposes. Tiffany does not genuinely dispute that the account records sought originated and remain in China, and as such, the compelled production of those records would implicate Chinese law. Accordingly, this factor weighs against the discovery

request. See Weixing Li, 2011 WL 6156936, at *6; Qi Andrew, 276 F.R.D. at 152.

### 4.  Alternative Means of Securing the Information

Tiffany and the Banks dispute whether the Hague Convention represents a reasonable alternative avenue for discovery. Tiffany contends that "a Hague Convention request issued by a United States court is not a realistic or meaningful option" (Pl.'s Mem. at 17), while the Banks suggest that "there is every reason to expect that China would honor a properly tailored Hague Convention request" (Mem. of Law. in Supp. of the Non-Party Banks' Mot. for Modification of the Preliminary Injunction Dated Aug. 3, 2011 ("Banks' Mem.") at 17).

In Société Nationale Industrielle Aérospatiale v. U.S. District Court for the Southern District of Iowa, 482 U.S. 522, 539-43 (1987), the Supreme Court declined to adopt a rule that would require litigants to turn to the Hague Convention as a matter of first resort when seeking evidence located in a signatory nation. The Court concluded that in some instances, proceeding through the Hague Convention "would be unduly time consuming and expensive" and a mandatory rule of first resort "would therefore be inconsistent with the overriding interest in the 'just, speedy, and inexpensive determination' of litigation in our courts." Id. at 542-43 (quoting Fed. R. Civ. P. 1). The Court did note, however, that in deciding whether to require a

party to proceed under the Convention, "courts should . . . take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state." Id. at 546.

Mindful of this guidance, the Banks point to a letter recently submitted by The People's Bank of China (the "PBOC") and the China Banking Regulatory Commission (the "CBRC") – two financial regulatory bodies in China – to four judges of the Southern District of New York with similar cases pending on their dockets.[7] In the letter, the PBOC and CBRC assert that Chinese law prohibits the Banks from disclosing customer account information pursuant to a U.S. court order, and they urge the judges to follow Judge Pitman's approach and "require parties seeking information relevant to a bank account in China to rely on the Hague Convention." (Healy Decl. Ex. 23.) In this vein, the PBOC and CBRC express that "[they] are committed to actively coordinating with the PRC Ministry of Justice and judicial organs in the PRC to ensure that they satisfy that requests for

---

[7] The letter was addressed to Judges Sullivan, Pauley, Pitman, and Batts. The letter referenced the Qi Andrew and Weixing Li cases that are discussed throughout this opinion, as well as Gucci America, Inc. v. Bagsmerchant, LLC, 10 Civ. 2911, which is before Judge Batts. (Healy Decl. Ex. 23.) At oral argument, counsel for the Banks indicated that this Court was not addressed on the letter simply because the instant motions were not yet pending at the time it was written. (Tr. of Oral Arg. at 3:14-16.)

seeking evidence under the Hague Convention within a reasonable time period and by following the procedures thereunder." (Id.)

Despite this reassurance, Tiffany persists in its position that the Hague Convention does not represent a reasonable alternative means of obtaining the requested discovery. At oral argument, Tiffany noted that in Qi Andrew, Judge Pitman transmitted a Hague Convention request to the relevant Chinese authorities on November 2, 2011, and over six months have now passed without any response. (Tr. of Oral Arg. at 6:1-22; see also Healy Decl. Ex. 28.) Tiffany also cites statistics concerning China's compliance rate with Hague Convention requests more generally, noting that, as reported by the Chinese Ministry of Justice, roughly half of the Hague Convention requests that China received from 2006 to 2010 for execution of letters rogatory or taking of evidence were returned unexecuted, and over this time period, it took an average of six months to one year for China to execute such requests. (Decl. of William P. Alford ("Alford Decl.") Ex. W.) The Banks counter by noting that China executed thirty-seven requests for evidence in the first half of 2010 alone, implying that China has increased its level of assistance in recent years. (Wu Decl. ¶ 33.)

While the parties may debate the proper interpretation of the above statistics, at bottom it remains speculative for either side to assert whether or not China will timely comply

with a Hague Convention request in the instant case. However, we feel obligated to consider that the Chinese government has expressed its intention to coordinate in facilitating discovery under these circumstances, and, notwithstanding the time that has passed since Judge Pitman submitted his Hague Convention request, it has yet to be seen whether Chinese authorities will act in a manner consistent with their expressed intent. It would seem prudent to forebear from assuming that the Hague Convention is not a viable option until Chinese authorities have had a meaningful opportunity to comply with similar requests but have failed to do so. See Hudson v. Hermann Pfauter GmbH & Co., 117 F.R.D. 33, 38 (N.D.N.Y. 1987) (placing burden on party opposing use of the Hague Convention to demonstrate that the Convention would prove unfruitful). But see Weixing Li, 2011 WL 6156936, at *9 (concluding that the Hague Convention did not represent a reasonable alternative given lack of concrete evidence demonstrating that China was likely to comply with a Hague Convention request).

### 5.   Competing National Interests

The fifth factor under the Restatement framework requires the Court to engage in the precarious task of balancing the interests of the United States against the interests of a foreign nation. Cautious of our inherent biases in engaging in

this endeavor, we look to the competing interests asserted by the litigants.

It can hardly be disputed that the United States has a strong national interest in safeguarding intellectual property rights and protecting consumers from counterfeit products. See id. at *11 (citing Hermès Int'l v. Lederer de Paris Fifth Ave., Inc., 219 F.3d 104, 107–08 (2d Cir. 2000)). Moreover, the United States has "a substantial interest in fully and fairly adjudicating matters before its courts." Milliken & Co. v. Bank of China, 758 F. Supp. 2d 238, 248 (S.D.N.Y. 2010) (internal quotation marks omitted).

Nevertheless, the interest of the United States is not as great in this context – in which the discovery request is initiated by a private, civil litigant - as it would be if the request were initiated by the U.S. government for purposes of an enforcement proceeding. See Minpeco, 116 F.R.D. at 523; cf. In re Grand Jury Subpoena Dated Aug. 9, 2000, 218 F. Supp. 2d 544, 562 (S.D.N.Y. 2002) ("In a criminal case brought by the Government, the Court owes some deference to the determination by the Executive Branch . . . that the adverse diplomatic consequences of the discovery request would be outweighed by the benefits of disclosure." (internal quotation marks omitted)). In addition, the Banks' status as non-parties "attenuate[s] the United States interest in enforcing discovery obligations." Qi

Andrew, 276 F.R.D. at 157; see also Ings v. Ferguson, 282 F.2d 149, 152 (2d Cir. 1960); Minpeco, 116 F.R.D. at 530.

On the other side of the equation, we acknowledge the interests asserted by the Chinese government in the letter submitted by the PBOC and CBRC. The letter expressed that the Chinese government has "material interests" in strictly enforcing its bank-secrecy laws because China's banking system is relatively new and strict client confidentiality will help engender trust in the system among the population. (Healy Decl. Ex. 23.) Courts in this Circuit afford considerable deference when a foreign nation intervenes in this manner and asserts its interests in the litigation.[8] See, e.g., Minpeco, 116 F.R.D. at 525; cf. Weixing Li, 2011 WL 6156936, at *10 (noting that "the Chinese government has not voiced any objections to disclosure in this case, which militates against a finding that strong national interests of the foreign country are at stake" (internal quotation marks omitted)).

While we do afford deference to the Chinese government's intervention, we nonetheless question the true extent of the Chinese interests at stake in this matter. Neither the Banks nor

---

[8] Although the letter submitted by the PBOC and CBRC was not addressed to this Court, we treat the letter as an expression of the Chinese government's interest in this matter given that the letter referenced contemporaneous cases involving nearly identical circumstances. We find no reason to question the assertion of counsel for the Banks at oral argument that the only reason this Court was not addressed on the letter was because the present motions were not yet pending at the time the letter was submitted.

the Chinese government has suggested or would suggest that the Chinese bank-secrecy laws were designed to shield transnational counterfeiters from facing accountability for their actions. The fact that numerous Chinese government organs are vested with the power to override the confidentiality provisions only underscores the notion that the secrecy laws were not designed to protect Chinese citizens who engage in unlawful behavior. Cf. Gucci Am., Inc. v. Curveal Fashion, No. 09 Civ. 8458 (RJS)(THK), 2010 WL 808639, at *6 (S.D.N.Y. Mar. 8, 2010) (noting that Malaysian bank-confidentiality laws permitted disclosure under certain circumstances, including when the protections were waived by the customer). Thus, as with our assessment of the U.S. interests concerned, we find that there are significant foreign interests implicated by the discovery request, but these interests are mitigated by the specific circumstances of the litigation.

On balance, we find that this factor does not swing the analysis in favor of either side.

### 6. **Hardship of Compliance**

The Banks contend that if they were to comply with the preliminary injunction, "the possibility of sanctions . . . is much more than speculative." (Banks' Mem. at 20.) The Banks again rely on the letter submitted by the PBOC and CBRC in support of their position. Referencing BOC's production of

21

information in compliance with Judge Sullivan's order, the PBOC and CBRC indicated that this course of action "constitute[d] a violation of Chinese banking laws and regulations" and that "[they] have already issued a severe warning to the bank and [they] are conducting a further investigation to evaluate the severity of the infraction and determine the appropriate sanctions." (Healy Decl. Ex. 23.) As additional evidence of the possibility of sanctions, the Banks cite to several cases in China in which banks, including BOC, have been held liable for violating the bank-secrecy laws. (Wu Decl. ¶¶ 22-24.)

In response, Tiffany notes that despite the prospect of sanctions hinted at by the PBOC and CBRC, BOC has not actually been punished in any manner for complying with Judge Sullivan's order. (Tr. of Oral Arg. at 5:2-12.) Tiffany also suggests that the Chinese cases cited by the Banks are wholly inapposite. In one of these cases, a Chinese bank had wrongfully turned over funds held in a customer's account to another individual who had claimed to be entitled to the funds, and the Chinese court ordered the bank to reimburse the aggrieved customer. (Wu Decl. ¶ 22.) In the other case cited by the Banks, three persons had installed surveillance equipment at one of BOC's branches and then used the information obtained to withdraw funds from a customer's account. (Id. ¶ 23.) The Chinese court ordered BOC to reimburse the customer for the money that was lost due to the

theft.  (Id.)  Tiffany argues that the circumstances of these cases are easily distinguishable from the instant matter, and Tiffany further points out that the Banks are not able to cite any instance in which a Chinese entity has been sanctioned for complying with a U.S. court order.

Finally, Tiffany implies that the possibility of sanctions in this case is not only speculative but is highly doubtful given that the Chinese government maintains large ownership interests in each of the banks. As detailed by Tiffany's expert, the Chinese government either directly or indirectly owns 67% of the A shares in BOC, 70% of the A shares in ICBC, and over 25% of the shares in CMB. (Alford Decl. ¶¶ 17-18.)

We are inclined to agree with Tiffany in our analysis of this factor. Although we are reluctant to conclude with any certainty how a foreign nation will choose to implement its own laws, we cannot ignore the reality that the Chinese government holds large ownership interests in the Banks and that the Banks have not been sanctioned for complying with discovery orders issued by a U.S. court under similar circumstances. We also find the Chinese cases cited by the Banks to be entirely distinguishable. See Weixing Li, 2011 WL 6156936, at *11. We conclude that the possibility of sanctions "is speculative at best," Milliken, 758 F. Supp. 2d at 250 (internal quotation marks omitted), and therefore the potential hardship of

compliance is not a factor that weighs in favor of amending the discovery order. See Weixing Li, 2011 WL 6156936, at *11-12.

### 7.  Good Faith of the Party Resisting Discovery

As a general matter, we do not consider the Banks' opposition to the preliminary injunction to reflect bad faith. See id. at *12; Qi Andrew, 276 F.R.D. at 160. The Banks objected to the terms of the preliminary injunction within days of being served with notice of such, and after a short of period of correspondence with Tiffany, the Banks initiated the process of filing the instant motion with the Court. These actions do not represent the type of "bad faith delays and dilatory tactics" that would weigh against an objecting party in the comity analysis. Milliken, 758 F. Supp. 2d at 250 (internal quotation marks and alteration omitted).

Like with the first factor, however, our analysis of this factor diverges with respect to BOC specifically. BOC acted as the acquiring bank for TiffanyOutletStore.com after it had notice of the preliminary injunction. Although BOC suggests that it would be "an enormous burden [to investigate] whether every one of its merchants worldwide could arguably be classified as being 'associated with[] . . . or in connection with . . . any of the Defendants'" (Docket no. 36), BOC likely overstates this burden. As Tiffany aptly notes, the fact that BOC was able to confirm that the infringing website was using BOC's payment

systems suggests that BOC is able to search for transactions based on the name of the merchant or website. (Docket no. 37.) Taken in conjunction with the fact that the website at issue has the word "Tiffany" in its name, it would seem possible, if not likely, that BOC could have identified the infringing website based on a simple search of its records. Further suggestive of bad faith by BOC is the previously discussed possibility that defendant Wooten is the registered owner of the primary or secondary merchant that granted TiffanyOutletStore.com the unauthorized access in question.

We recognize that our discussion in this regard is somewhat speculative, but this speculation is attributable to the dearth of information that BOC has provided as to how the infringing website gained access to its systems. BOC having made the choice to provide such scant information, we find it reasonable to infer that BOC did have the means to prevent the ongoing infringement but refrained from taking appropriate action. Accordingly, this final factor weighs against BOC.

### 8. **Summary**

Based on the totality of the factors, we conclude that separate treatment is warranted for ICBC and CMB on the one hand and BOC on the other. For ICBC and CMB, we find the possibility of a reasonable alternative means of discovery to be a deciding consideration. China has yet to have a meaningful opportunity to

demonstrate whether it will comply with a Hague Convention request under these circumstances. Given the Chinese government's stated intention to cooperate with such a request, as well as the near certainty that this issue will continue to arise in future litigation, we consider it appropriate to require Tiffany to direct its discovery requests for ICBC and CMB through the Hague Convention in the first instance. Should this process prove futile, future courts will surely take notice and adjust their analysis accordingly.

With respect to BOC, we find that the bank's recent role as the acquiring bank for an infringing website tips the balance of the analysis in favor of Tiffany. This fact strengthens the importance of the information sought and suggests potential bad faith on behalf of BOC. We place particular importance on the former factor, as BOC may very well possess information that will enable Tiffany to discover defendants' identities or even recover a portion of defendants' illicit profits. Thus, we order BOC to comply with the discovery provisions of the preliminary injunction.

## II. Asset Restraint

Tiffany and the Banks dispute whether the Court has the authority to issue the prejudgment asset restraint contained in the preliminary injunction.

The preliminary injunction references Rule 64 of the Federal Rules of Civil Procedure, 15 U.S.C. § 1116(a), and the Court's inherent equitable power as separate sources of authority for the asset restraint. However, in its moving papers, Tiffany focuses on the latter two sources of authority and implicitly disclaims reliance on Rule 64 (and therein potentially relevant state procedures). (See Pls.' Reply Mem. of Law in Further Supp. of their Opp'n to Third Party Banks' Mot. for Modification of the Prelim. Inj., and Cross-Mot. to Compel Compliance with the Prelim. Inj. ("Pls.' Reply") at 8-9.)

For this reason, we find it curious that the parties devote considerable space in their briefs to the continued viability of the doctrine of New York law known as the "separate entity rule." This rule – under which each branch of a bank is considered "in no way concerned with the accounts maintained by depositors in other branches," Parbulk II AS v. Heritage Maritime, SA, 935 N.Y.S.2d 829, 832 (N.Y. Sup. Ct. 2011) (internal quotation marks omitted) – has historically been applied to restrict the prejudgment attachment of assets, or postjudgment turnover of assets, that is otherwise authorized under the New York Civil Practice Law and Rules ("C.P.L.R."). See, e.g., Allied Maritime, Inc. v. Descatrade SA, 620 F.3d 70, 74 (2d Cir. 2010); Shaheen Sports, Inc. v. Asia Ins. Co., Nos. 98 Civ. 5951 (LAP), 11 Civ. 920 (LAP), 2012 WL 919664, at *3-8

(S.D.N.Y. Mar. 14, 2012). Because Tiffany is not seeking a prejudgment attachment under the C.P.L.R., the separate entity rule is simply not relevant at this stage of the litigation.[9] Weixing Li, 2011 WL 6156936, at *4 n.6 (similarly concluding that the separate entity rule was inapposite); see also Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559 n.10 (9th Cir. 1992) (explaining that a prejudgment attachment of assets under state law is distinct from a prejudgment asset restraint carried out under a federal court's inherent powers).

The actual question with regard to the asset restraint is whether this Court has the inherent equitable power to issue the restraint.[10] Under the Supreme Court's holding in Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-33 (1999), a federal district court maintains the inherent authority to issue a prejudgment asset restraint only if the

---

[9] As discussed at oral argument, the continued viability of the separate entity rule may become relevant if Tiffany obtains a default judgment and then seeks a postjudgment turnover order directed at defendants' assets held at foreign branches of the Banks. (Tr. of Oral Arg. at 10:16-11:21.)

[10] We decline to decide whether the asset restraint is authorized under 15 U.S.C. § 1116(a). This provision of the Lanham Act provides federal district courts with the power "to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark." 15 U.S.C. § 1116(a). While this provision is certainly framed in broad terms, Tiffany does not cite to a single case in which a court has authorized a prejudgment asset restraint pursuant to this provision. Because we hold that the asset restraint falls within the Court's inherent equitable power, we need not consider the novel application of 15 U.S.C. § 1116(a) advocated by Tiffany. See Reebok Int'l, 970 F.2d at 558-59 (recognizing the possibility that 15 U.S.C. § 1116(a) authorizes a prejudgment asset freeze but declining to decide the issue given the court's holding that the restraint was within its inherent equitable power.)

plaintiff states a cause of action for final equitable relief and the prejudgment asset restraint preserves the availability of that final relief. See also Animale Grp. Inc. v. Sunny's Perfume Inc., 256 F. App'x 707, 708-09 (5th Cir. 2007); Motorola, Inc. v. Abeckaser, No. 07 Civ. 3963 (CPS)(SMG), 2009 WL 1362833, at *4 n.4 (E.D.N.Y. May 14, 2009). Tiffany and the Banks dispute whether Tiffany's complaint asserts a claim for such final equitable relief.

Under the Lanham Act, a successful plaintiff is entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). Pursuant to this provision, Tiffany's complaint includes a request for an accounting of defendants' profits.[11] (Compl. at 33.)

The Second Circuit has made clear that when awarding an accounting of profits under the Lanham Act, a district court maintains discretion to shape such relief subject to the principles of equity. See Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 71-72 (2d Cir. 1998) (explaining that "a district court has discretion . . . to award only a partial accounting, if the aims of equity would be better served"); see also George Basch Co. v. Blue Coral, Inc., 968

---

[11] Specifically, the Complaint requests that the Court "[d]irect Defendants to account to Tiffany for their profits and order that Tiffany recover Defendants' illicit profits and damages arising out of the acts of deception and infringement described above." (Compl. at 33.)

F.2d 1532, 1537-38 (2d Cir. 1992). Consistent with this notion, numerous courts have held that an accounting of profits under the Lanham Act constitutes final equitable relief that authorizes a court to issue a prejudgment asset restraint to ensure the availability of that relief. See, e.g., Balenciaga Am., Inc. v. Dollinger, No. 10 Civ. 2912 (LTS), 2010 WL 3952850, at *7 (S.D.N.Y. Oct. 8, 2010); Motorola, 2009 WL 1362833, at *3-4; Animale Grp., 256 F. App'x at 708-09; Reebok Int'l, 970 F.2d at 559.

We concur with these decisions. We find that an accounting of profits under the Lanham Act constitutes discretionary equitable relief and the assets to be frozen include funds to which Tiffany may be entitled in connection with this relief. Thus, the Court maintains the inherent equitable power to issue a prejudgment restraint of defendants' assets. See Weixing Li, 2011 WL 6156936, at *4.[12]

_____

[12] In George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d Cir. 1992), the Second Circuit explained that there are three theories for an award of profits under the Lanham Act: (1) if the defendant has been unjustly enriched, (2) if the plaintiff sustained damages from the infringement and the defendant's profits are to serve as a rough proxy for damages, and (3) if an accounting is necessary to deter future violations. Several district courts have held that whether an accounting of profits under the Lanham Act should be considered equitable relief depends on which of these three theories applies to the given claim. See Juicy Couture, Inc. v. L'Oreal USA, Inc., No. 04 Civ. 7203 (DLC), 2006 WL 559675, at *1 (S.D.N.Y. Mar. 7, 2006) (holding claim to be equitable when based on unjust enrichment theory); Emmpresa Cubana del Tabaco v. Culbro Corp., 123 F. Supp. 2d 203, 206-08 (S.D.N.Y. 2000) (same); Daisy Grp., Ltd. v. Newport News, Inc., 999 F. Supp. 548, 552 (S.D.N.Y. 1998) (holding claim to be legal rather than equitable when profits were to serve as a proxy for damages). In our view, because

The Banks contend that even if the Court has the authority to issue an asset restraint in this case, that authority does not extend extraterritorially. Like Judge Sullivan, we find this argument to be without merit. See id. Given that the Court has personal jurisdiction over both defendants and the Banks, the Court's authority to restrain defendants' assets that are controlled by the Banks extends to wherever those assets may be located. See United States v. First Nat'l City Bank, 379 U.S. 378, 384 (1965) ("Once personal jurisdiction of a party is obtained, [a district court] has authority to order it to 'freeze' property under its control, whether the property be within or without the United States.").

Finally, the Banks request that, if necessary, the Court exercise its discretion and not extend the asset restraint to funds held in China due to the same considerations of comity discussed with regard to the discovery order. The Banks suggest that Chinese law prohibits them from freezing a customer's funds just as it prohibits them from producing a customer's account records.

---

these three motivations for an award of profits are not mutually exclusive, we are skeptical as to the manageability of this approach in resolving the equitable-versus-legal-inquiry. Indeed, in the instant case, it is far from clear which of the three theories best characterizes Tiffany's claims. Thus, we decline to apply the George Basch framework in determining whether the accounting that Tiffany seeks is equitable in nature.

We agree with the Banks that principles of comity are properly considered in this context, but we are not persuaded that these considerations warrant a decision to lift the instant asset restraint – with respect to any of the banks. Unlike in the context of the document request, there is no reasonable alternative analogous to the Hague Convention that would allow Tiffany to achieve the objective of the asset freeze. In this regard, we note that the Hague Convention process that we require Tiffany to undertake for ICBC and CMB will take time to run its course, and without an asset restraint in place, there would be little hope of recovering the illicit funds held at these banks. Given the apparent strength of Tiffany's intellectual property claim, we are reluctant to leave it without a practical remedy.

## CONCLUSION

For the reasons stated above, the Banks' motion and Tiffany's cross-motion are each granted in part and denied in part. Tiffany is directed to proceed with its discovery request to ICBC and CMB through the Hague Convention, but BOC is directed to comply with the disclosure requirements of the preliminary injunction. The asset restraint provisions of the preliminary injunction remain in effect for all three banks.

**SO ORDERED.**

Dated:      New York, New York
             May 23, 2012

                                        NAOMI REICE BUCHWALD
                                        UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**Attorney for Plaintiffs:**
Robert L. Weigel, Esq.
Gibson, Dunn & Crutcher, LLP
200 Park Avenue
New York, NY 10166

**Attorney for Non-Party Banks BOC and ICBC:**
Andrew Rhys Davies, Esq.
Allen & Overy LLP
1221 Avenue of the Americas
New York, NY 10020

**Attorney for Non-Party Bank CMB:**
Dwight A. Healy, Esq.
White & Case LLP
1155 Avenue of the Americas
New York, NY 10036